UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



FILED

MAY 27 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 03 cv 3578 |
| ) | Judge Amy St. Eve |
| QT, INC.,Q-RAY, COMPANY, BIO-METAL, ) | Magistrate Judge Levin |
| INC., QUE TE PARK, a.k.a. ANDREW Q. PARK, ) | |
| and JUNG JOO PARK, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM SUPPORTING PLAINTIFF'S *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER, ASSET FREEZE, ORDER
TO SHOW CAUSE, AND OTHER EQUITABLE RELIEF**

**I.     INTRODUCTION**

This action involves a purported pain-relief product sold by defendants called the "Q-Ray Ionized Bracelet." Defendants have misled consumers and reaped millions of dollars in ill-gotten gains through deceptive advertisements for the product. This court should intervene to stop such practices and to freeze defendants' assets to preserve them for consumer redress.

Defendants claim the Q-Ray bracelet is "ionized" through a secret process. This mysterious "ionization" process supposedly transforms a simple metal bracelet into a device that instantly reduces or even eliminates chronic and severe pain in the wearer. Defendants' advertisements claim that the Q-Ray bracelet "delivers lasting relief for [] pain and discomfort throughout [the] entire body," and that it works on "back pain, sciatic pain, persistent headaches, sinus problems, tendinitis, joint dysfunction or injuries." In television infomercials, dozens of men and women don the Q-Ray bracelet and declare that their back, leg, hip, knee, and wrist pain has suddenly disappeared.

A recent study conducted by the highly respected Mayo Clinic, however, found that the Q-Ray bracelet is no better than a placebo at relieving musculoskeletal pain. Furthermore, defendants lack any

competent and reliable scientific support for their other pain-relief claims. Despite the Mayo study, however, defendants continue to sell their bracelet with far-reaching pain-relief claims to vulnerable, often desperate, consumers. Defendants' deceptive and misleading representations about the ability of the Q-Ray bracelet to alleviate or eliminate pain constitute deceptive acts or practices and false advertising in violation of Sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 52.

Given the blatantly deceptive nature of defendants' advertising, especially in light of published scientific data controverting their claims, the Federal Trade Commission ("FTC") brings this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), seeking an *ex parte* temporary restraining order enjoining defendants from engaging in the misleading and deceptive advertising and sale of pain-relief products and ordering ancillary equitable relief, including (1) an asset freeze; (2) an accounting of all sales of these products; (3) expedited discovery; and (4) an order to show cause why a preliminary injunction should not issue. This relief is needed to halt the ongoing deception and to evaluate the extent of consumer injury. Without such relief, defendants will continue to defraud thousands of consumers and may well dissipate assets that could be used to redress the injury that they have caused and continue to cause. The FTC's request for a show cause order for a preliminary injunction seeks additional relief necessary to protect consumers and should be granted.

## II. PARTIES

### A. Plaintiff

Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which prohibit, respectively, unfair or deceptive acts or practices, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including consumer redress. 15 U.S.C. § 53(b).

### B. Defendants

Defendants are three related companies – QT, Inc., Q-Ray, Company, and Bio-Metal, Inc. –

plus two individuals, Que Te Park (a/k/a Andrew Q. Park) and Jung Joo Park, who control the companies. Together, defendants have operated a common business enterprise that sells a purported pain-relief device, the Q-Ray bracelet, to consumers.

Defendant QT, Inc. ("QT"), is an Illinois corporation with its principal office or place of business at 680 Fargo Avenue, Elk Grove Village, Illinois, 60007. It transacts or has transacted business in this District, and throughout the United States, through the advertising, marketing, sale and distribution of the Q-Ray bracelet. (PX E ¶¶ 3-7, Atts 1-7.) Defendant Q-Ray, Company, is an Illinois corporation with its principal office or place of business at 680 Fargo Avenue, Elk Grove Village, Illinois, 60007. It transacts or has transacted business in this District, and throughout the United States, through dissemination of advertisements for the Q-Ray bracelet through U.S. media outlets and its Internet site, www.qray.com, and through distribution of the Q-Ray bracelet. (PX E ¶¶ 8, 9, Atts. 6-8.) Defendant Bio-Metal, Inc., formerly known as Bio-Ray International, Inc., is an Illinois corporation with its principal office or place of business at 680 Fargo Avenue, Elk Grove Village, Illinois, 60007. It transacts or has transacted business in this District, and throughout the United States, through sale and distribution of the Q-Ray bracelet. (PX E ¶¶ 10,11, Atts.6, 9.)

Defendant Que Te Park, also known as Andrew Q. Park, is president of all three companies. At all times material to this Complaint, acting alone or in conjunction with others, Mr. Park has formulated, directed, controlled or participated in the acts and practices set forth in this Complaint. Mr. Park resides and/or transacts business in this District. Turner Decl. (PX E ¶ 12, Att. 1, 8, 9.) Defendant Jung Joo Park is secretary of all three companies. At all times material to this Complaint, acting alone or in conjunction with others, Ms. Park has formulated, directed, controlled or participated in the acts and practices set forth in this Complaint. Ms. Park resides and/or transacts business in this District. (PX E ¶ 13, Att.1, 8, 9.)

### III. DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

#### A. Defendants' Deceptive Advertising for the Q-Ray Ionized Bracelet

The Q-Ray Ionized Bracelet is a C-shaped metal bracelet. Some versions are gold- or silver-plated. Defendants' advertisements claim that the bracelet is "ionized" through a secret process, which gives it special pain-relieving abilities. The bracelet is sold via 30-minute television infomercials and

three identical websites, www.qray.com, www.q-ray.com and www.bio-ray.com. Depending on the cosmetic style of the bracelet (e.g.,"natural" v. "platinum" finish), it is sold for between $49 and $249.95. The advertised price on the infomercial is $99 plus shipping and handling of $9.95. (PX E ¶ 15, 18; PX F ¶¶ 2, 6.) At least two versions of the infomercial have been airing since September 2000; the current version has been one of the most frequently aired infomercials for the past seven months. (PX E ¶ 14, Att. 10.) Total sales of the Q-Ray bracelet are unknown but are likely in the millions of dollars. (PX E ¶ 3, Att. 3.)

The infomercial for the Q-Ray bracelet claims (often through "testimonials" from users) that the bracelet relieves or eliminates almost every type of acute and chronic pain within seconds or minutes:

- ON SCREEN: Allen Brown; Had back pain for 5 years...
  UNIDENTIFIED MALE: My back has been bothering me probably for the last... four or five years...
  ON SCREEN: "within seconds the pain was gone."
  ALLEN BROWN: And when he put this on me, it was almost – within 10 or 15 seconds, the pain was gone.

- SHEILA THOMPSON: I wore it last night and in 24 hours all my pain's disappeared from my arm, my hip and my shoulder.
  ALLEN BROWN: It was amazing to me that it worked that quickly.
  SANDRA KOHLER: It's just been over an hour and I don't have any pain.

- JOHN EARLY [infomercial host]: Time and time again people are telling us their Q-Ray bracelet works wonders to relieve the aches and pains they live with every day. Not just from persistent headaches, but joint stiffness, injuries, even back pain.

- MALE ANNOUNCER: If you are one of millions of people suffering from back pain, sciatic pain, persistent headaches, sinus problems, tendinitis, joint dysfunction or injuries, if you've become convinced you will live with pain and discomfort for the rest of your life, don't believe it – because now there is an incredible non-medical device that is helping to change the lives of people everywhere.

Compl. Ex. B. In addition, the website flashes statements such as, "Imagine a life without pain" and "Don't live with pain and discomfort another day!" Compl. Ex. C.[1] The infomercial and website offer

---

[1] In addition, the website's metatags refer to pain relief. "Metatags" are keywords embedded in the source code for a webpage that are invisible to an average consumer but are used by some search

-4-

no detailed scientific explanation for these supposedly miraculous results, other than that the Q-Ray bracelet balances the body's negative and positive ions.

Defendants' ads further claim that scientific tests have proven the effectiveness of the Q-Ray bracelet in reducing or eliminating pain. The infomercials, for example, show a "thermal test," in which an infrared image of the back of an individual suffering back pain shows areas of increased temperature, supposedly reflecting "increased blood flow typically . . . associated with inflammation and pain." After five minutes of wearing the Q-Ray bracelet, however, the monitor supposedly shows reduced temperature, which purportedly indicates "much less inflammation. Patient reports much less pain."[2]

What defendants fail to mention is that a recent clinical trial from the Mayo Clinic found the Q-Ray bracelet to be no more effective than a placebo in reducing pain. In this study (published in November 2002),[3] Mayo Clinic researchers conducted a randomized, double-blind study on more than 600 patients comparing the effectiveness of the Q-Ray bracelet versus a placebo bracelet in relieving musculoskeletal pain. One half of the patients wore the "ionized" Q-Ray bracelet; the other half wore an identical, non-ionized (placebo) bracelet. All of the bracelets were provided by defendant QT. Neither the patients nor the researchers knew whether bracelets worn by the patients were the active or placebo versions, a standard procedure known as "double-blinding." The patients rated their pain on standardized questionnaires, on a scale of 0 to10, over a 28-day period. The study data showed *no*

---

engines to respond to search requests. The metatags for www.qray.com include "severe pain relief," "cure for arthritis," and "headache." (PX E ¶ 17, Att.11.) Together with the visible portion of the website, these metatags also communicate deceptive representations, because they could direct a consumer searching the Internet for an arthritis cure to the www.qray.com site, even if the actual webpage does not explicitly claim arthritis pain relief. This could contribute to the impression that the Q-Ray bracelet is effective for arthritis (or other) pain relief.

[2] Defendants' website claims that the Q-Ray bracelet has also been proven "effective" by "bi-digital-O-ring" testing. In this "test," a patient forms an "O" with his index finger and thumb. A doctor supposedly tests the patient's strength by forming an intersecting "O" using his own index finger and thumb and pulling on the patient's "O." Finally, the website claims that "hand dynanometer" testing, using a squeeze device that purports to test hand strength, shows that the Q-Ray bracelet is "effective." Compl.Ex. C.

[3] The study can be found at http://www.mayo.edu/proceedings/2002/nov/7711a2.pdf, and also as Attachment 2 to the Declaration of Dr. Marc Hochberg (PX G).

significant difference between the two groups at any point during the study or at the end of the study. In fact, the placebo group showed essentially the same pain improvement as the Q-Ray group. Accordingly, the authors concluded that the Q-Ray bracelet was no more effective than placebo bracelets for treating muscular and joint pain.

The FTC's expert, Dr. Marc Hochberg, reviewed the Mayo Clinic study and states that it is well-conducted and valid. (PX G ¶¶ 25.) Isolated, uncontrolled, unblinded illustrations using thermal tests, "O-rings," or hand dynanometry, on the other hand, are not reliable to show efficacy. (PX G ¶¶ 27-29.) As Dr. Hochberg notes in his declaration, experts in his field of pain relief require competent and reliable double-blind, controlled testing to support the types of claims defendants are making to the general public, not simply anecdotes. (PX G ¶¶ 18, 29.)

Defendants have no evidence that the Q-Ray bracelet relieves pain from causes as varied as arthritis, headaches and sciatica; moreover, there is solid evidence that the product does *not* work for musculoskeletal pain, except for a placebo effect that could likely be achieved with any similar-looking metal bracelet. (PX G ¶ 26.) Despite this, however, defendants continue to advertise and sell their product to consumers with claims that their product is miraculously effective in alleviating pain. Defendants are knowingly disseminating false and unsubstantiated claims about the Q-Ray bracelet's ability to relieve pain. These misleading and deceptive representations must be enjoined.

### B. Defendants' Deceptive "Money Back Guarantee" for the Q-Ray Ionized Bracelet

The infomercial repeatedly assured consumers that the Q-Ray bracelet was a "risk-free" purchase. The product was advertised with an "ironclad" money back guarantee, in which dissatisfied consumers could return the product for a full refund:

- MALE ANNOUNCER: And remember, your Q-Ray ionized bracelet is backed by our ironclad money back guarantee. If you're not absolutely 100 percent satisfied, just send your Q-Ray back for a full refund of your purchase price.

- JOHN EARLY: Imagine what it must feel like to be able to throw away your cane forever. Folks, if you're suffering from nagging pain or maybe your body just doesn't work the way it used to, pick up the phone right now, right now, and start wearing the Q-Ray ionized bracelet for 30 days absolutely risk-free.

ON SCREEN: RISK FREE OFFER; Try Q-Ray for 30 days!

Compl., Ex. B.

In reality, however, many consumers did not receive this "ironclad" money back guarantee. Although the infomercial repeatedly displayed the Internet address, "www.qray.com" on the screen, according to complaints filed with the FTC and the Better Business Bureau ("BBB"), some consumers who ordered the product from the website later discovered that the 30-day satisfaction guarantee did not apply to Internet orders. There was no clear and conspicuous disclosure either on the infomercial or on the website that the exact same product was not guaranteed if ordered online.[4] *See, e.g.*, PX H (Declaration of consumer Cecilia Wilke) ¶ 6; PX I (Declaration of consumer Irene Everingham) ¶ 5.

Even consumers who purchased the Q-Ray bracelet by phone have experienced difficulties and delays in obtaining the refunds to which they were entitled under the "ironclad guarantee." In complaints filed with the FTC and the BBB, many consumers allege that their refund requests were delayed or simply ignored. (PX E ¶¶ 19, 20.) Some consumers who were dissatisfied with their Q-Ray bracelet were unable to get refunds, despite repeatedly contacting defendants, until they complained to the Better Business Bureau.[5] In fact, the majority of complaints on file about QT (127 out of 160) dealt with consumers' problems in obtaining refunds; of these consumers, 42 specifically complained of their dissatisfaction with the product. *Id.* Defendants' claims of a "risk-free" money back guarantee for dissatisfied consumers are therefore misleading and deceptive.

## IV.  LEGAL ARGUMENT

In its complaint, the FTC seeks a permanent injunction and other equitable relief to redress the injury caused by defendants' deceptive practices. To prevent defendants from committing further law violations pending resolution of this action and to preserve the possibility of effective final relief, the FTC seeks in this motion an *ex parte* TRO, an asset freeze, expedited discovery, and an order to show

---

[4] Indeed, buried on defendants' website was a guarantee merely against "defects in materials and/or workmanship." Only recently have defendants changed the website and clarified the guarantee terms so that online purchasers also receive a 30-day satisfaction guarantee.

[5] As of May 20, 2003, defendant QT, Inc.'s BBB rating is listed as "unsatisfactory" because of unresolved consumer complaints. (PX E ¶ 21.)

cause why a preliminary injunction should not issue.

### A. Section 13(b) of the FTC Act Authorizes the Court to Grant the Requested Relief

The FTC Act, in 15 U.S.C. § 53(b)(2), authorizes a district court to grant permanent injunctions to enjoin violations of the Act in "proper cases." Matters involving false and deceptive advertising are "proper cases" for injunctive relief under the FTC Act. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1989) (false and deceptive advertising to induce purchase is a "proper case"). Incident to its authority to issue permanent injunctive relief under the second proviso of § 53(b)(2), this Court has the inherent equitable power to grant all temporary and preliminary relief necessary to effectuate final relief, including an *ex parte* TRO, an asset freeze, a preliminary injunction, and other necessary remedies. *World Travel*, 861 F.2d at 1026, 1031; *see also FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989).[6]

### B. This Case Meets the Standard for a TRO and Preliminary Injunction

In cases where, as here, the government moves for a preliminary injunction to enforce a federal statute, the court is not required to consider the same factors as it would in a motion for injunctive relief among private litigants. *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987); *see also FTC v. World Wide Factors*, 882 F.2d 344, 346-47 (7th Cir. 1989) (involving lawsuit filed to enforce Section 5 of the FTC Act). Instead, this court must only "1) determine the likelihood that the FTC will ultimately succeed on the merits and 2) balance the equities." *World Travel*, 861 F.2d at 1028-29. Irreparable injury is presumed in a statutory enforcement action. *Elders Grain, Inc.*, 868 F.2d at 903.

---

[6] This Court has granted *ex parte* temporary restraining orders with asset freezes and other equitable relief in FTC actions brought under Section 13(b). *See, e.g., FTC v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715 (N.D. Ill. Aug. 5, 1999) (Marovich, J.) (noting that *ex parte* TRO with asset freeze had previously been granted).

1.  **There Is A Substantial Likelihood That the FTC Will Prevail on the Merits Because Defendants' Misrepresentations Violate the FTC Act**

Section 5(a) of the FTC Act prohibits deceptive acts and practices in or affecting commerce, and Section 12 prohibits the dissemination of any false advertisement in order to induce the purchase of food, drugs, devices, or cosmetics.[7] To prevail, the FTC must demonstrate that "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *Pantron I Corp.*, 33 F.3d at 1095 (*citing In re Cliffdale Associates, Inc.*, 103 F.T.C. 110, 164-65 (1984)); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *World Travel*, 861 F.2d at 1029. As set forth below, the FTC has established these elements sufficiently for the Court to grant a temporary restraining order and preliminary injunction.

First, defendants represent that the Q-Ray bracelet relieves musculoskeletal and other pain and that thermal and other tests "prove" that the Q-Ray bracelet is effective. These claims are either express (*e.g.*, "Try your Q-Ray ionized bracelet and experience how much better you can feel starting the very first day, the very first minute you try it on") or made through consumer testimonials claiming the product immediately relieved their various types of pain. These claims are patently misleading and deceptive, as shown by the Mayo Clinic study, in which the Q-Ray bracelet was found no more effective than a placebo. "Where ... a product's effectiveness arises solely as a result of the placebo effect, a representation that the product is effective constitutes a 'false advertisement' [under § 12 of the FTC Act] even though some consumers may experience positive results." *Pantron I Corp.*, 33 F.3d at 1100. Defendants participated in the study and are aware of the results; indeed, they have apparently been in contact with the Mayo Clinic regarding the conduct of the study. *See* Declaration of Counsel, attached to Plaintiff's Notice of *Ex Parte* Motion for Temporary Restraining Order ("Counsel Decl.") ¶ 3.a. Furthermore, none of the so-called tests or testimonials cited in defendants' ads can

---

[7] Under Section 12, an advertisement is "false" if it is "misleading in a material respect." 15 U.S.C. § 55(a)(1). The Q-Ray bracelet is a "device" under the FTC Act because it is an apparatus intended for use in the mitigation of pain-related diseases and is also intended to affect to function of the body. *See* 15 U.S.C. § 55(d).

support such sweeping efficacy claims.[8] Despite knowledge of competent scientific evidence to the contrary, defendants continue to disseminate these misleading and deceptive claims about the Q-Ray bracelet through their television infomercial and websites. Defendants also offered a mostly hollow "money back" guarantee, which was not honored in many cases because of undisclosed technicalities or defendants' outright failure to respond to customer complaints.

Second, defendants' misrepresentations are likely to mislead reasonable consumers. This case involves express promises that the Q-Ray bracelet would relieve pain; reasonable consumers have no obligation to doubt the veracity of such express claims. Moreover, false claims are inherently "likely to mislead." *In re Thompson Med. Co.*, 104 F.T.C. 648, 788, 818-19 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986). For those consumers still skeptical of the products and claims, defendants offered the assurance of a supposedly risk-free money-back guarantee. *See In re Porter & Dietsch, Inc.*, 90 F.T.C. 770, 866 (1977), *aff'd*, *Porter & Dietsch v. FTC*, 605 F.2d 294 (7th Cir. 1979) ("a money back guarantee reinforces in consumers' minds the sincerity of the advertiser's assertions, including those that are false and exaggerated").

Finally, these claims are material because they go to the core reason why consumers would buy the Q-Ray bracelet. *Kraft*, 970 F.2d at 322 (statement material if likely to affect consumer's decision to buy the product or service). Consumers would not spend $100 or more for a simple metal bracelet if defendants had not misrepresented that it was proven effective in relieving nearly every type of pain. *See FTC v. Sabal*, 32 F. Supp.2d 1004, 1009 (N.D. Ill. 1998) ("The court agrees that [defendant] would have been unable to command such high prices for her hair farming products but for her representations that they were able to restore lost hair, were superior to Rogaine and Minoxidil, and were supported by scientific evidence."). Moreover, express misrepresentations, as well as implied

---

[8] Although defendants' ads rely heavily on the testimonials of users who claim their pain was cured by the Q-Ray bracelet, anecdotal "evidence" of consumers' individual experiences with a product cannot constitute competent and reliable scientific substantiation of the medical claims made by defendants. *Cf. FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1273 (S.D. Fla. 1999) (testimony of consumer witnesses who allegedly lost substantial amounts of weight while using product was "anecdotal information" that did "not constitute meaningful proof of [defendants'] weight loss claims"). Moreover, given the Mayo Clinic study results, it is entirely possible that the testimonialists who proclaimed their positive results were in fact simply experiencing a placebo effect.

claims that significantly involve health or safety, are *presumed* to be material. *Pantron I Corp.*, 33 F.3d at 1096; *Kraft*, 970 F.2d at 322. Because defendants' claims about the Q-Ray bracelet's pain-relieving properties and the money back guarantee involved "health, safety, or other areas with which the reasonable consumer would be concerned, [such as] . . . the purpose, safety, efficacy, or cost of the product . . . [or] its durability, performance, warranties or quality," the claims are material as a matter of law. *In re Cliffdale Assocs.*, 103 F.T.C. 110, 176-84 (FTC's Policy Statement on Deception); *see also Pantron I Corp.*, 33 F.3d at 1095-96 (*citing Cliffdale Assocs.* standard with approval); *Novartis Corp., v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (same).

In this case, defendants' deception is not only likely to mislead consumers, it has caused (and continues to cause) significant monetary loss to vulnerable consumers. The FTC has provided, as just two examples, declarations from consumers suffering from chronic pain due to fibromyalgia and arthritis. They were persuaded by the defendants' advertisements that the Q-Ray bracelet works and spent more than $100 each on the products, desperate for an answer to their (and their loved ones') painful ailments. The Q-Ray bracelet did absolutely nothing for them. Their disappointment and frustration is magnified by defendants' refusal to honor the advertised guarantee and refund their money. (PX H, I.) Given defendants' continuing misrepresentations targeted at hopeful consumers such as these, the FTC has demonstrated a likelihood of success on the merits and a temporary restraining order and preliminary injunction against defendants' misleading advertisements is warranted.[9]

### 2. The Parks are Individually Liable for Injunctive and Monetary Relief

The FTC is also likely to succeed in demonstrating that Que Te Park and Jung Joo Park are individually liable for the violations of the FTC Act described above. An individual may be held liable for violations of the FTC Act if the Court finds that the individual: (1) actively participated in or had authority to control the deceptive practices, and (2) had or should have had knowledge or awareness of the practices. *See Amy Travel*, 875 F.2d at 573-74; *FTC v. Febre*, No. 94 C 3625, 1996 WL

---

[9] Because they act as a common enterprise, the corporate defendants should be subject to joint and several liability. Corporations constitute a common enterprise where "the evidence shows that there [is] no real distinction among the companies." *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201-02 (C.D. Cal. 2000). In this case, it appears that Que Te Park is President and Jung Joo Park is Secretary of all defendant companies; furthermore, all the companies are located at the same address.

396117, *8 (N.D. Ill. July 3, 1996). Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573. In addition, the "degree of participation in business affairs is probative of knowledge." *Id.* At 574.

Que Te Park and Jung Joo Park have the authority to control the acts and practices of the companies and are aware of the deceptive practices at issue here. As described in Section II.B, the defendant companies are closely-held corporations, of which Que Te Park serves as president and director and Jung Joo Park serves as secretary. In addition, the Parks participated in and knew of the Mayo Clinic results, since their company, defendant QT, provided study bracelets to the researchers. The results were published in a peer-reviewed journal freely available on the Internet and widely publicized in the media. After the study's unfavorable results were released, QT has been in communication with the Mayo Clinic regarding the conduct of the study. *See* Counsel Decl. ¶ 3.a.

Both Parks are therefore in positions to control the practices of these entities, and as a result of their positions as corporate officers and ownership of the companies, knew or should have known of their companies' deceptive practices. *See, e.g., FTC v. Growth Plus Int'l Marketing, Inc.*, No. 00 C 7886, 2001 WL 128139 at *3 (N.D. Ill. Jan. 9, 2001) (Aspen, J.) (defendants' corporate roles demonstrated knowledge); *FTC v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715, at *5-6 (Marovich, J.) (N.D. Ill. Aug. 5, 1999) (officer and director positions with companies provided "ample evidence" that individuals had authority to control the purported practices and acts at issue and had some knowledge of the deceptive practices). Thus, in light of the Parks' authority to control the companies, and the degree of their involvement and participation in the companies' activities, they can be held individually liable.

### 3. The Equities Weigh in Favor of Granting Injunctive Relief

Once the FTC has shown a likelihood of success on the merits, the Court must balance the equities, assigning greater weight to the public interest than to any of defendants' private concerns, in determining whether to grant injunctive relief. *World Travel*, 861 F.2d at 1029. The balance of the equities tips strongly in the FTC's and consumers' favor here. Immediate injunctive relief is necessary to protect the public from future financial harm that will inevitably result from defendants' deceptive

practices. In contrast, defendants have no legitimate interest to balance against the need for an injunction. They are making demonstrably deceptive and misleading claims to vulnerable consumers suffering chronic and acute pain. The FTC's proposed temporary restraining order only restrains defendants from engaging in this illegal conduct and preserves assets. Such a restriction does not work an undue hardship on defendants, for they have no legitimate interest in persisting with conduct that violates federal law. *See, e.g., World Wide Factors*, 882 F.2d at 347 (upholding finding of "no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment"); *Sabal*, 32 F. Supp. 2d at 1009 (defendant "has no legitimate interest in continuing to make false and misleading claims about her product").

### C. An *Ex Parte* TRO with an Asset Freeze and Expedited Discovery is Necessary for Effective Final Relief

#### 1. An Asset Freeze and Expedited Discovery Are Necessary to Preserve the Possibility of Effective Relief for Consumers

As part of the final recovery in this case, the FTC seeks redress for the consumers who were defrauded by defendants' misrepresentations. To preserve the possibility of such relief, and to ensure that funds do not disappear during the course of this litigation, the FTC requests that this Court order a temporary freeze of defendants' assets. Such a freeze would merely preserve the status quo for the benefit of consumers while the FTC determines the scope of defendants' assets and potential consumer injury.

This Court's power to order an asset freeze derives from its equitable power to order consumer redress, *Febre*, 128 F.3d at 534, and courts in this district have repeatedly exercised this authority. *See FTC v. TLD Network* Ltd., No. 02 C 1475 (N.D. Ill. Feb. 28, 2002) (Holderman, J.); *FTC v. 1st Financial Solutions, Inc.*, No. 01-CV-8790 (N.D. Ill. Nov. 19, 2001) (Kocoras, J.); *Growth Plus Int'l Marketing*, No. 00 C 7886, 2001 WL 128139 (N.D. Ill. Jan. 9, 2001) (Aspen, J.) *FTC v. Med Resorts Int'l, Inc.*, No. 00 C 4893, 2000 WL 1889635 (N.D. Ill. Dec. 27, 2000) (Castillo, J.). An asset freeze was granted in a similar case involving health-related fraud, *FTC v.*

*Sabal*, 32 F. Supp.2d 1004, 1009 (N.D. Ill. 1998) (Lindberg, J.). In *Sabal*, the Court found that defendant's unsubstantiated claims about a purported baldness treatment warranted the issuance of a preliminary injunction barring her from marketing the product as well as freezing her assets. The *Sabal* court noted that the public had a strong interest "in preventing the dissipation of assets that may be necessary to provide restitution." *Id.* As in *Sabal,* defendants' advertising and sale of the Q-Ray bracelet is based upon deceptive representations. Given defendants' course of conduct set forth above, the FTC's strong likelihood of ultimate success in this action, and the magnitude of relief for which defendants would be liable, there is a significant risk of dissipation of assets while the case is pending. Without an asset freeze, there is a strong likelihood that funds will not be available to satisfy any final order granting restitution to defrauded consumers.

The asset freeze should extend to the Parks' individual assets as well. The freeze of individual assets is warranted because the FTC is likely to prevail in showing that they are liable for consumer redress both for their own and their companies' practices. The Parks' knowledge of and participation in the acts or practices that violated the FTC Act, and their failure to act within their authority to control those practices, makes them individually liable for monetary damages, particularly in light of the Mayo Clinic study of their product and their repeated failure to provide refunds as promised, which has resulted in an "unsatisfactory" rating with the BBB. *See World Travel,* 861 F.2d at 1031 (affirming asset freeze as to individual defendants); *Windermere,* 1999 WL 608715, at *1 (granting asset freeze as to individual defendants' assets). As the individual defendants' primary business appears to be the sale of these fraudulent products through the defendant corporations, their funds should also be preserved for consumers.

The FTC also seeks leave to conduct limited expedited discovery, so that it may locate defendants' assets, preserve documentary evidence relating to defendants' activities, and to determine the past and ongoing harm to consumers. District courts are authorized to depart from normal discovery procedures and fashion discovery to meet discovery needs in particular cases. Fed. R. Civ. P. 1, 26(b), 34(b). The relief requested here is narrowly tailored to minimize any burden to defendants.

### 2. An *Ex Parte* Temporary Restraining Order Should be Issued

This is an appropriate case for the issuance of an *ex parte* TRO. Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders where the facts show that irreparable injury, loss, or damage will result if notice is given. *See* Fed. R. Civ. P. 65(b). Absent *ex parte* relief, defendants here may use the notice time period to dissipate or conceal assets or destroy documents. *See* Counsel Decl. ¶¶ 3-5. Despite knowledge of a negative study on the Q-Ray bracelet, defendants continue to advertise and promote the product through deceptive claims, causing ongoing harm to consumers. Moreover, defendants' refusal to issue refunds pursuant to their own money-back guarantee further illustrates their bad faith. This concern of asset dissipation or document destruction is heightened here because defendants' sole or primary business appears to be the deceptive advertising and sale of Q-Ray bracelets. It is therefore appropriate for this Court to issue the requested relief on an *ex parte* basis.

## V. CONCLUSION

Defendants have caused and are likely to continue to cause consumer injury because of their violations of the FTC Act. To prevent ongoing consumer harm and to help assure the possibility of effective final relief, including monetary redress, plaintiff FTC requests that this Court issue the requested injunctive relief.

Respectfully submitted,

*/s/ Serena Viswanathan*
SERENA VISWANATHAN
RIELLE C. MONTAGUE
Federal Trade Commission
600 Pennsylvania Avenue, NW, NJ-3212
Washington, DC 20580
Phone: (202) 326-3244, 2645
Fax: (202) 326- 3259

*/s/ Steven M. Wernikoff*
STEVEN M. WERNIKOFF
Federal Trade Commission
55 E. Monroe Street, Suite 1860
Chicago, IL 60603-5713
Phone: (312) 960-5634
Fax: (312) 960-5600
ATTORNEYS FOR PLAINTIFF

Dated: May 27, 2003