**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 03 C 3578** |
| | ) | |
| v. | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **QT, INC., Q-RAY COMPANY,** | ) | |
| **BIO-METAL, INC., QUE TE PARK,** | ) | |
| **a.k.a. ANDREW Q. PARK, and** | ) | |
| **JUNG JOO PARK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Following a seven-day bench trial, the Court found in *FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006) ("Memorandum Opinion") that Defendants QT, Inc., Q-Ray Company, Bio-Metal, Inc., and Que Te Park (collectively "Defendants") violated the Federal Trade Commission Act. The facts are set forth in the Memorandum Opinion. The Court entered a final judgment order on November 13, 2006 ("Final Judgment Order"), ordering Defendants to provide for consumer redress, disgorgement, and restitution, and granting injunctive relief. Defendants have now brought two motions: (1) Motion to Alter or Amend the Court's Nov. 13, 2006 Final Judgment Order and To Reconsider Its Sept. 8, 2006 Memorandum Opinion and Order ("Motion to Reconsider"); and (2) Motion to Stay Enforcement of the Final Judgment Order Pending Resolution of Defendants' Post-Trial Motions and Pending Appeal ("Motion to Stay"). On November 28, 2006, the Court granted

in part the Motion to Stay pending resolution of the motion. For the following reasons, the Court grants in part and denies in part Defendants' Motion to Reconsider, and grants in part and denies in part Defendants' Motion to Stay.

## I. MOTION TO RECONSIDER

Under Fed. R. Civ. P. 52(b), a party may move the court to amend its findings or make additional findings, and to amend the judgment accordingly. Fed. R. Civ. P. 52(b). Post-trial motions are to be used only to correct manifest legal or factual errors or to present newly discovered evidence. *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 920 (N.D. Ill. 2002). A losing party should not use a motion to reconsider to retry its case or rehash arguments it has made previously. *Id.* at 921. "If evidence is available to a party at the time of trial, the party is obligated to make those arguments at that time . . . ." *Id.*

Defendants offer ten main reasons why the Court should alter, amend, or reconsider the Memorandum Opinion and Final Judgment Order: (1) "the evidence at trial failed to support numerous material findings of fact and conclusions of law," of which Defendants list several; (2) the Court improperly concluded that the Q-Ray Ionized Bracelet ("the Q-Ray bracelet") is a device as that term is used in the FTC Act; (3) "the FTC failed to prove that QT's advertising probably would mislead a reasonable consumer"; (4) the Court "adopted the wrong legal standard for substantiation"; (5) the Court improperly concluded that QT did not have a reasonable basis for its alleged advertising claims; (6) the Court improperly found that QT's advertising was false; (7) the Court improperly found that QT's return policy guarantee was false; (8) the Court improperly granted injunctive relief; (9) "the disgorgement

2

amount awarded by the Court was clearly erroneous"; and (10) the Court improperly found that the claims against Mr. Park were not barred by *res judicata* or collateral estoppel. Reasons one through eight and reason ten rehash arguments made and rejected in the Memorandum Opinion, and will not be further discussed because the Court stands by its findings and conclusions therein set forth. Reason nine, the propriety of the amount of disgorgement ordered by the Court, warrants further analysis.

The Court ordered Defendants to disgorge $22.5 million in profits earned from direct sales of the bracelet to consumers. The factual findings underlying that ruling are as follows, with citations to the record provided in italics:

> **Total Sales of the Q-Ray Bracelet.**
>
> QT's gross sales of the Q-Ray bracelet from January 1, 1996 through June 30, 2003 were $137,172,907. *Stipulated.*
>
> QT's gross "consumer direct" sales for the period were $114,609,182. *Stipulated.*
>
> QT's net sales direct to consumers from January 1, 1996 through June 30, 2003 were $87,476,933. *Stipulated.*
>
> **Total Sales Since Inception of Infomercials.**
>
> There was a substantial jump in sales of the Q-Ray bracelet after the infomercials started airing in 2000 and that significant increase in sales continued as the infomercials kept airing. *T. [Transcript] 96-97. . . .*
>
> QT's gross sales direct to consumers in 2000 were $6,190,566, compared to $175,488 in 1999. *Stipulated.*
>
> \*\*\*

Thus QT's net sales from January 1, 2000 through June 30, 2003, when the infomercials were airing, were $98,424,773. *Stipulated.*

> i. Net sales direct to consumers from January 1, 2000 through June 30, 2003 were $87,019,840. *Stipulated.*
>
>> a. Net sales direct to consumers in the year 2000 totaled $5,538,850. *Stipulated.*
>>
>> b. Net sales direct to consumers in the year 2001 totaled $14,759,120. *Stipulated.*
>>
>> c. Net sales direct to consumers in the year 2002 totaled $37,177,379. *Stipulated.*
>>
>> d. Net sales direct to consumers from January 1, 2003 through June 30, 2003 totaled $29,544,491. *Stipulated.*
>
> ii. Net sales to wholesalers from January 1, 2000 through June 30, 2003 were $11,404,933. *Stipulated.*

QT's net profit for the years 1996 through September 2003 was approximately $22,600,000. *T. 363-64; PX [Plaintiff's Exhibit] 70.*

> i. QT's net profit for 2000 was approximately $440,000. *PX 70.*
>
> ii. QT's net profit for 2001 was approximately $860,000. *PX 70.*
>
> iii. QT's net profit for 2002 was approximately $9,100,000. *T. 363-64; PX 70.*

iv. QT's net profit for 2003 was approximately
$12,100,000. *T. 363-64; PX 70.*

Memorandum Opinion at 88-90.

Pages 363-64 of the transcript are from Que Te Park's testimony. The relevant portions are as follows:

> Q. Why don't we go to an exhibit. It would be Plaintiff's Exhibit 70. Plaintiff's Exhibit 70 is a profit and loss statement that QT, Inc., has provided the Federal Trade Commission, and I . . . Would like to blow up the column on the year 2002 . . . .
>
> \*\*\*
>
> Q. . . . [F]or 2002, the net income to the company was approximately $9 million . . . . Can you see that?
>
> A. Yeah, I can see that, yes.
>
> Q. Okay. And for 2003 going across, the net income was about $12 million; is that correct?
>
> A. Yes, I can see that.
>
> Q. And then the net income for the years 1996 though September of '03 is about $22 million; is that correct?
>
> A. Yes, I can see that.

Although PX 70 was shown to the witness, it was never entered into evidence, and the Court erred in citing to it in support of the factual findings. Therefore, the Court reconsiders its ruling that Defendants disgorge $22.5 million in profit.[1]

---

[1] Defendants argue that Mr. Park's testimony only establishes that he saw the figures displayed by the FTC, not that he agreed with those figures. Having observed Mr. Park's testimony, the Court concludes that Mr. Park accepted those figures as accurate.

Defendants argue that the FTC has not reasonably approximated the amount of profits attributable to direct sales of the bracelet, and that the Court must amend the Memorandum Opinion and Final Judgment Order to remove any profit disgorgement provision. Alternatively, Defendants seek to introduce new evidence related to their profits.

The relevant Seventh Circuit case addressing the FTC's burden in establishing the amount of damages is *FTC v. Febre*, 128 F.3d 520 (7th Cir. 1997). In that case, the district court entered summary judgment for the FTC, and ordered the defendants to make restitution to all affected consumers, or to disgorge the full amount of consumer losses should any refunds go unclaimed. *Id.* at 533. The amount was calculated based on statements from the defendants' employees, an FTC computer specialist, and a certified public accountant. *Id.* at 535. The defendants argued that the district court abused its discretion in the amount of disgorgement ordered because of data missing from the FTC's calculations, but presented no evidence to the district court challenging the accuracy of the number reached by the FTC. *Id.* The Seventh Circuit held that the FTC "must show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate." *Id.* The court upheld the award because "the amount was properly supported in the record and defendants failed to dispute the facts in a timely and appropriate manner." *Id.* at 536.

While *Febre* involved a different measure of damages and procedural posture than this case, its analysis is relevant: if the FTC reasonably approximated Defendants' profits and Defendants failed to introduce evidence at trial refuting the FTC's calculations, the FTC has

6

met its burden. Defendants presented no evidence to refute the FTC's calculations, so the issue is whether the FTC's approximation was reasonable.[2]

In its post-trial brief to the Court, the FTC argued that the Court should order a minimum of $22 million plus pre-judgment interest in disgorgement, and characterized $22 million as Defendants' "ill gotten gains" and as "net profit." Pl. Post-Trial Br. at 42. The FTC cited as support for this argument its proposed Conclusions of Law at 51-57, and its Finding of Fact 383a. Finding of Fact 383a cites only to the portions of Mr. Park's testimony above, and states that QT's net profits for 1996 through September 2003 was $22 million, with net profits of $9 million in 2002 and $12 million in 2003.

The FTC's approximation, while far from ideal, was reasonable. The $22 million figure is over-inclusive in that it includes profits earned before 2000 and after June 30, 2003 (the period of time during which the infomercials aired), and includes sales to wholesalers. It is clear from the evidence in the record, however, that the overwhelming majority of Defendants' business came from sales of the Q-Ray bracelet directly to customers during the period of time during which the infomercials aired. Thus, it was incumbent upon Defendants to present evidence showing the flaws in the FTC's calculation. Having made the strategic

---

[2] It is important to note that the issue before the Court is not whether the FTC has proven damages as required by the FTC Act to establish a violation. The parties have stipulated that Defendants' sales direct to consumers from January 1, 2000 through June 30, 2003 were $87,019,840. As *Febre* makes clear, a court may use as the appropriate measure of damages the amount of consumer losses. 128 F.3d at 546. The Court uses the *Febre* analysis as guidance in determining how to reach an appropriate minimum disgorgement figure using its equitable discretion.

decision to expect the Court to find the FTC's calculation inadequate, Defendants must now live with the consequences of that decision and will not be permitted to introduce new evidence. Nonetheless, the Court does not intend to order disgorgement of a profit figure that the record shows to be too high, so to the extent shown by the evidence in the record, the Court will adjust the disgorgement figure.

The FTC has demonstrated through the testimony of Mr. Park that QT's total profits for 2002 through September 2003[3] were $21 million. There are 21 months between January 2002 and September 2003, three of which are after June 30, 2003. Thus one-seventh of the $21 million ($3 million) is roughly attributable to the period of time after June 30, 2003 and inappropriate as a measure of disgorgement. This reduces the total amount of disgorgement to $18 million. Because an agreed Preliminary Injunction was entered in May 2003, sales of the Q-Ray bracelet were reduced. No precise breakdown was provided, however, so the Court gives Defendants the benefit of allocating the profits proportionately throughout this period.

Further, the evidence in the record makes clear that not all of QT's sales were made directly to consumers. Sales made to wholesalers were not a part of the FTC's case, so the Court will adjust the disgorgement figure to account for wholesale sales. The parties stipulated that total net sales for January 1, 2000 through June 30, 2003 were $98,424,773,

---

[3] While PX 70 was not introduced into evidence, it was used as demonstrative evidence during Mr. Park's testimony. PX 70 did not contain figures beyond September 2003, so the Court understood Mr. Park's testimony regarding 2003 to mean through September.

and that net sales direct to consumers during that time period were $87,019,840. This reveals that during the relevant time period, 88.4% of sales were made directly to consumers. Giving Defendants the benefit of the doubt by assuming that the profit margin on direct sales and sales made to wholesalers was the same,[4] 88.4% of the $18 million in profits earned from January 2002 through September 2003, $15.9 million, is an appropriate measure of QT's profits during the relevant time period. Therefore, the Court amends the Memorandum Opinion and Final Judgment Order to order disgorgement of a minimum of $15.9 million in profits. While this figure omits profits earned in 2000 and 2001, during which time there were net sales to consumers of $20,297,970, the evidence in the record does not support a number beyond $15.9 million because the FTC did not introduce evidence of the actual profits for the years 2000 and 2001.[5]

Defendants also argue that the evidence does not support a ruling that Mr. Park is jointly and severally liable for disgorgement of all of QT's profits, and that his disgorgement liability should be limited to the amount of profits he actually received. The parties stipulated that QT paid $10,678,853 in shareholder distributions to Mr. Park between 2001 and September 2003, but there is no further evidence of profits Mr. Park personally

---

[4]Logic would dictate that the profit margin on direct sales to consumers would be higher than sales to wholesalers because the price charged to consumers would be greater than the price charged to wholesalers.

[5]Defendants argue that the Court should reduce the disgorgement amount to eliminate profits earned on foreign sales. There is no evidence in the record as to foreign sales, so the Court does not consider this argument.

received. While *Febre* makes clear that the Court has equitable discretion to hold Mr. Park liable for the full amount of restitution, and identifies both making consumers whole and preventing unjust enrichment as the goals of disgorgement, 128 F.3d at 537, the Court's intent with respect to the disgorgement (as opposed to restitution) figure was to require Defendants to disgorge, at a minimum, the amount of profit they earned from sales of the bracelet directly to consumers.

The $10,678,853 in profit earned by Mr. Park personally must be similarly adjusted to remove profits earned on sales made after June 30, 2003, and profits earned from wholesale sales. Assuming that QT's profits were equal during each of the months from January 2001 through September 2003, three months out of a total of 33, or one-eleventh of the $10,678,853 paid to Mr. Park, is attributable to sales made outside the relevant time period. This reduces the figure to $9,708,048. Further, 88.4% of total sales were made directly to consumers, which reduces the total to $8,581,915, again assuming that profits on both consumer sales and wholesale sales were the same. Therefore, the Court amends the Memorandum Opinion and Final Judgment Order to make Mr. Park jointly and severally liable for $8,581,915 of disgorgement. Mr. Park remains jointly and severally liable for all consumer redress actually sought, up to $87,019,840.

Finally, the Court awarded pre-judgment interest based on the $22.5 million figure, which should now be based on the adjusted figures. The Final Judgment Order is amended to order QT, Inc., Q-Ray Company, and Bio-Metal, Inc. jointly and severally liable to disgorge a minimum of $15.9 million plus pre-judgment interest calculated pursuant to the

formula provided in the Final Judgment Order, and to order Que Te Park jointly and severally liable for $8,581,915 plus pre-judgment interest calculated pursuant to the formula provided in the Final Judgment Order.

## II. MOTION TO STAY

Four factors are used to determine whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

First, Defendants have not made a strong showing that they are likely to succeed on the merits. The Court has reviewed the Memorandum Opinion, Final Judgment Order, and the evidence and arguments presented at trial, and concludes that Defendants are not likely to succeed on the merits on appeal.

Second, Defendants have shown some risk of irreparable harm absent a stay. Defendants make two arguments: that they will be forced into bankruptcy once the FTC begins the collection process, and that their reputation will be irreparably harmed once consumers are notified of their rights to redress. The Court agrees that these are possibilities. The financial risks are somewhat alleviated, however, because the FTC has agreed not to disburse any funds to consumers until any appeal has been resolved.

Third, a stay will substantially compromise the rights of consumers. The FTC has estimated that a delay of one year, a reasonable estimation of the amount of time that would

pass until any appeal is resolved, would result in an inability to locate 75,000 eligible consumers who are likely to have moved. Those consumers would lose the ability to share in the redress provisions of the Final Judgment Order. Further, the FTC rightfully notes that until enforcement of the Final Judgment Order begins, there remains the possibility that Defendants will dissipate assets otherwise available for consumer redress.

Fourth, the public interest does not favor granting a stay. There is a strong public interest in providing redress to consumers for Defendants' wrongful conduct. While Defendants argue that the public interest favors ensuring their financial ability to appeal, which they predict will be lost once enforcement begins, this remains to be seen. Asset discovery has not been completed, and the extent of Defendants' ability to obtain an appeal bond is unclear, particularly in light of the reduced disgorgement figure.

Taking these factors together, a stay is inappropriate. Defendants are unlikely to succeed on the merits, and in the Court's judgment the potential harm to consumers outweighs the potential harm to Defendants. Under these circumstances, Defendants, whose violations of the FTC Act have landed them in this position, should not benefit to the detriment of the consumers they have already harmed. *See Hinrichs v. Bosma* 440 F.3d 393, 396 (7th Cir. 2006) (harm to defendants must outweigh harm to opposing party). Defendants' Motion to Stay is denied, except that the FTC shall wait to distribute funds to consumers until after any possible appeal to the Seventh Circuit has been resolved.

### III. CONCLUSION

Because the Court cited to an exhibit that was not in evidence in determining the

amount of Defendants' profits to be disgorged, the Court has reconsidered the Memorandum Opinion and Final Judgment Order on that point. The Court concludes that the FTC reasonably approximated Defendants' profits, requiring Defendants to come forward with evidence supporting a lower figure, but that the evidence in the record only supports a finding of $15.9 million in profits earned by QT, Inc., and $8,581,915 by Mr. Park. Defendants' remaining arguments for reconsideration simply rehash arguments previously rejected. A stay pending appeal is inappropriate given the unlikelihood that Defendants will succeed on appeal and the risk of irreparable harm to consumers who will be denied any recovery if they can no longer be located.

**Defendants' Motion to Reconsider is denied except as follows: The Memorandum Opinion and Final Judgment Order are amended to find QT, Inc., Q-Ray Company, and Bio-Metal, Inc. jointly and severally liable to disgorge a minimum of $15.9 million plus pre-judgment interest calculated pursuant to the formula provided in the Final Judgment Order, and to find Que Te Park jointly and severally liable to disgorge a minimum of $8,581,915 plus pre-judgment interest calculated pursuant to the formula provided in the Final Judgment Order. Defendants' Motion to Stay is denied except as follows: The FTC shall distribute funds to consumers only after any appeal to the Seventh Circuit has been resolved.**

**SO ORDERED THIS 22nd DAY OF JANUARY, 2007.**

```
_____
```
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Theodore H. Hoppock
Heather Hippsley
Janet M. Evans
Edward Glennon
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW, NJ-3213
Washington, DC 20580

Steven M. Wernikoff
Federal Trade Commission
55 East Monroe Street
Suite 1860
Chicago, IL 60603-5713

Counsel for Plaintiff

Michael A. Ficaro
Ross E. Kimbarovsky
Richard H. Tilghman
UNGARETTI & HARRIS, LLP
3500 Three First National Plaza
70 West Madison
Chicago, IL 60602-4283

Counsel for Defendants