**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 03 C 3578 |
| | ) | |
| v. | ) | Magistrate Judge Morton Denlow |
| | ) | |
| **QT, INC., Q-RAY COMPANY,** | ) | |
| **BIO-METAL, INC., QUE TE PARK,** | ) | |
| **a.k.a. ANDREW Q. PARK, and** | ) | |
| **JUNG JOO PARK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

On December 22, 2006, the Court granted in part and denied in part Defendants' motion to release frozen funds to pay their attorneys' fees. The Court ordered any interest earned on the frozen accounts to be released to Defendants' law firm, Ungaretti & Harris, LLP, ("Ungaretti") on the condition that Ungaretti subject itself to this Court's jurisdiction in the event the Federal Trade Commission ("FTC") were to seek review of the order. On December 7, 2007, the FTC moved this Court to reconsider the December 22 order in light of newly discovered evidence that demonstrates possible misrepresentations and misconduct by Ungaretti. For the reasons stated below, this Court denies the motion for reconsideration.

## I.  PROCEDURAL HISTORY

This case commenced on May 27, 2003, when the FTC filed its complaint and motion for a temporary restraining order, alleging that Defendants violated various provisions of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 52, 53(b).

### A.     Preliminary Injunction Order and Supplemental Orders

On June 11, 2003, Judge John W. Darrah entered a stipulated Preliminary Injunction Order, which included a provision freezing $17 million of Defendants' assets. Provisions for attorneys' fees and expenses were included as follows:

> D.  Notwithstanding the $17 million [in frozen assets], Defendants may pay reasonable, usual, ordinary, and necessary business and living expenses, and attorneys' fees, costs, and expenses of up to $2.5 million from existing assets. Defendants may also pay such reasonable, usual, ordinary, and necessary business and living expenses, and attorneys' fees, costs and expenses from any income of any type generated after the date of this Order. Defendants shall produce a monthly balance sheet and accounting of such expenses and income to the Federal Trade Commission no later than five (5) days after the end of each month.
>
> E.  [O]nce Defendants secure and retain $17 million in assets . . ., any additional existing assets over the $17 million may be used to pay reasonable, usual, ordinary, and necessary business and living expenses, and attorneys' fees, costs and expenses . . .

Def. Rep., Ex. B., Preliminary Injunction Order, p.5 ¶ III.D&E.

On June 13, 2003, the Court entered a supplemental order ("First Supplemental Order") to the Preliminary Injunction clarifying the amount of frozen assets. Supplemental Order, Dock. No. 36, June 13, 2003. In April 2005, Ungaretti filed a motion to again modify the Preliminary Injunction Order to consolidate the various frozen accounts into a single

segregated separate account so that a better interest rate could be achieved. Ungaretti attached a proposed order to its motion, stating in part in a whereas clause that "the interest and dividend earnings from the cash assets . . . are not . . . available to be used for any purpose, including in the business of QT, Inc. or Q-Ray Company, by Que Te Park or Jung Joo Park." Def. Rep., Ex. A. Judge Ian H. Levin entered the proposed stipulated order, titled the Second Supplemental Order to the Stipulated Order for Preliminary Injunction with Asset Transfer Restrictions and other Equitable Relief ("Second Supplemental Order"), on April 26, 2005. Second Supplemental Order, Dock. No. 86, Apr. 26, 2005; Def. Rep., Ex. A. The Second Supplemental Order specifically provided that "This Order does not otherwise amend or alter the Stipulated Order of the Supplemental Order to the Stipulated Order." Id. At 3.

**B.     Final Judgment Order**

Following a seven-day bench trial, on September 8, 2006, the Court entered its Memorandum Opinion and Order, finding that all Defendants other than Jung Joo Park violated the FTC Act, and ordering refunds to consumers, disgorgement of Defendants' profits, and a permanent injunction to be set forth in a final judgment order. *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 975-76 (N.D. Ill. 2006). The final judgment was entered on November 13, 2006. In addition to its injunctive provisions, the Final Judgment Order requires Defendants (other than Jung Joo Park) to provide refunds to any unsatisfied consumers up to a total of $87,019,840 plus pre-judgment interest, but to disgorge a minimum of $22.5 million in profits regardless of the amount of refunds sought by consumers. The assets frozen under the Preliminary Injunction Order belonging to Jung Joo Park were released, but the

remaining assets were to remain frozen. The Court's Final Judgment Order further provided that:

> the Court reserves the right to permit, if allowed by law, some of the restricted assets . . . to be used to pay Defendants' reasonable attorneys fees and costs . . . up to [$1.3 million]. Within seven (7) days from the date of entry of this Order, Defendants shall file an up-to-date petition identifying the reasonable attorneys' fees and costs incurred in this matter . . . [T]he Court may enter a supplemental order concerning attorneys' fees and costs incurred in this matter.

Final Judgment Order, Dock. No. 211, Nov. 13, 2006, p. 18 ¶ XIV.

**C.   The Court's Order to Release the Interest Earned on the Frozen Funds to Pay Defendants' Attorneys' Fees**

On December 22, 2006, upon consideration of Defendants' petition to release frozen funds to pay their attorneys' fees, the Court ordered release of the interest earned on the frozen funds to pay Defendants' attorneys' fees, totaling $522,100.40, but denied release of the underlying frozen funds. *FTC v. QT, Inc.,* 467 F. Supp. 2d 863 (N.D. Ill. 2006). Separating the issues of release of the underlying frozen funds and release of the interest earned on the frozen accounts, the Court concluded that on the basis of the Preliminary Injunction Order, Ungaretti could have reasonably relied on the interest as a source of funds from which its fees would be paid. *Id.* at 867-68. Thus, the Court ordered any interest earned on the frozen accounts to be released to the Ungaretti firm on the condition that Ungaretti subject itself to this Court's jurisdiction in the event the FTC were to seek review of the order. *Id.* at 870. The Court denied release of the underlying frozen funds, however, until such time as Defendants could demonstrate that despite their fiscal prudence, insufficient

unfrozen assets have been available to pay their legal bills. *Id.* at 869-70.

On February 21, 2007, the FTC moved the Court to reconsider the December 22 order in light of newly discovered evidence that Defendants allegedly misrepresented the existence and status of certain assets at the time the motion for release of frozen funds was made, and had already received interest on certain frozen accounts. Two days later, Defendants filed for bankruptcy, and such proceedings are ongoing. On March 12, 2007, this Court denied the FTC's motion for reconsideration, finding that evidence of Defendants' failure to disclose the existence or status of certain assets, while relevant to a motion to release the underlying funds, is irrelevant with respect to the interest. *FTC. v. QT, Inc.,* 359 B.R. 889, 892 (Bankr. N.D. Ill. 2007). This Court also found the fact that Defendants had already received some interest on the accounts was irrelevant, as was any alleged misrepresentations made by Defendants. *Id.* Because the decision to release the frozen interest was based on the equities as they relate to the Ungaretti firm, this Court stated that only alleged misconduct or misrepresentation by the firm would make reconsideration appropriate. *Id*

**D.     The FTC's Current Motion for Reconsideration**

Currently before this Court is the FTC's motion to reconsider the December 22 order based upon alleged newly discovered evidence demonstrating misrepresentations and possible misconduct by Ungaretti. The FTC alleges that on or about April 17, 2007, during the course of Defendants' bankruptcy case, the FTC learned that QT, Inc., with the assistance of an Ungaretti partner, amended its 2003 tax return to take a deduction of nearly $9.4 million by asserting that the assets that had been frozen by the Court's Preliminary Injunction

5

Order constituted a "qualified settlement fund" ("QSF") that was dedicated to paying off any judgement obtained by the FTC. Hoppock Decl., Ex. 3.

Under 26 C.F.R. § 1.468B-1, a QSF is a trust, account or fund: 1) established pursuant to an order of, among others, a Court of the United States, 2) that is established to satisfy one or more contested or uncontested claims, and 3) that is a trust under state law or has its assets segregated from other assets of the transferor. 26 C.F.R. § 1.468B-1. A QSF must be subject to the continuing jurisdiction of the entity establishing it (in this case, the Court). 26 C.F.R. § 1.468B-1(c)(1). The fund is established upon the preliminary approval or order creating the fund, "even if that order or approval may be subject to review or revision." 26 C.F.R. § 1.468B-1(e).

Defendants attached to its amended tax returns a memorandum in support of its creation of the QSF along with copies of the Court's Preliminary Injunction Order and the Second Supplemental Order. The memorandum stated that the frozen assets complied with the QSF requirements, and also stated that "[t]he owners of these accounts have no access, use or other attributes of ownership, including no right to the income from the restricted accounts." Hoppock Decl., Ex. 3, memorandum at 1. The memorandum also later states that "neither the Company nor any related party has any access or control over these accounts." Hoppock Decl., Ex. 3, memorandum at 5.

The FTC argues that Ungaretti made a misrepresentation to the Court when asserting that it should receive the interest on the frozen assets, and that Ungaretti could not have reasonably relied upon that interest as a source of payment for its attorneys' fees based on

its representation otherwise to the IRS. The FTC argues that the creation of the QSF placed additional restrictions on the frozen assets that were not contained in the original Preliminary Injunction. Specifically, the FTC asserts the QSF set aside Defendants' cash that was subject to the Preliminary Injunction, and also set aside the income from those cash assets.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 60(b), a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . 2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); [or] 3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b). In order for a court to grant a motion for reconsideration based on newly discovered evidence under Rule 60(b)(2), the moving party must demonstrate the following:

> 1) the evidence was discovered following trial;
> 2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred;
> 3) the evidence is not merely cumulative or impeaching;
> 4) the evidence is material; and
> 5) the evidence is such that a new trial would probably produce a new result.

*Jones v. Lincoln Elec. Col,* 188 F.3d 709, 732 (7th Cir. 1999).

To prevail on a Rule 60(b)(3) motion based on fraud or misrepresentation, the moving party must prove that "1) the party maintained a meritorious claim at trial, and 2) because of the fraud, misrepresentation or misconduct of the adverse party, 3) the party was prevented from fully and fairly presenting its case at trial." *Lonsdorf v. Seefeldt,* 47 F.3d 893, 897 (7th

7

Cir. 1995). The moving party does not need to show that he would have won the case had the fraud or misconduct not occurred, but rather he need only show, by clear and convincing evidence, that it affected his ability to present his case. *Ty Inc. v. Softbelly's,* 353 F.3d 528, 536 (7th Cir. 2003); *Londsdorf,* 47 F.3d at 897; *but see Ty Inc.,* 353 F.3d at 537 (discussing the Court's doubt over whether the clear and convincing standard applies to Rule 60(b)(3)). Rule 60(b)(3) "applies to both intentional and unintentional misrepresentations." *Londsorf,* 47 F.3d at 897.

### III. DISCUSSION

**A.      The QSF is not newly discovered evidence under Rule 60(b)(2).**

In response to the FTC's motion, Defendants primarily argue that the alleged newly discovered evidence, the statements in the QSF that Defendants had no right to use or access income from the frozen funds, does not constitute newly discovered evidence because it is cumulative of other record evidence and it is not likely to produce a different outcome.

**1.      The statements in the QSF are cumulative of other evidence in the record.**

Defendants argue that the statements contained in the QSF documents are cumulative to other evidence already in the record. This Court agrees. Although the statements made in the QSF were not discovered at the time of the December 22 order, similar statements were made at the oral argument and in Defendants' briefs. At the oral argument on their petition, Ungaretti stated several times that Defendants did not have access to the interest on the frozen funds:

> [T]he consolidation was done in order to move all of the funds into interest

> bearing accounts. Now, that amount of interest, the $467,000, was an amount that accrued outside of the frozen asset itself. So it was in addition to the funds that were effectively frozen. The defendants were not entitled to those funds because they were in frozen accounts, and it was very clear to us when we came on to the case that Judge Levin, who had the case previously, did not want to entertain any further discussion about the frozen funds at that time.
>
> Technically, the stipulated injunction and the supplemental injunction did not prohibit the use of such funds, it was just procedurally impossible to come to court every time to ask for that type of relief.
>
> [W]e would suggest that the interest that was received on these frozen assets was that kind of income. It was just encumbered because it happened to be in this frozen account.

Decl. Hoppock., Ex. 9, at 24 & 25.

Ungaretti also made a similar statement in its brief on the petition:

> To date, the cash assets from the funds frozen by the Ex Parte TRO and Preliminary Injunction Order have accrued $487,741 in interest. The Preliminary Injunction Order does not preclude Defendants from using the interest from frozen funds for the payment of attorneys' fees. *See* ¶ III.D of the Preliminary Injunction Order ('any income of any type generated after the date of' the Preliminary Injunction Order may be used for attorneys' fees and living expenses). The interest accrued from those frozen funds has never been released to Defendants.

Dock. No. 213, Nov. 20, 2006, Def. Petition at 3 n.4.

In addition, the Second Supplemental Order also states "the interest and dividend earnings from the cash assets . . . are not . . . available to be used for any purpose, including the business of QT, Inc. or Q-Ray Company, by Que Te Park or Jung Joo Park." Def. Rep., Ex. A. Defendants argue this statement is identical in substance to the statement in the QSF that Defendants had no right to use or access the income from the frozen accounts. The FTC failed to raise the Second Supplemental Order as a basis for rejecting Defendants' motion to

9

release fees to Ungaretti. Because the FTC signed the stipulated order and thus knew of this evidence, however, the Second Supplemental Order constitutes record evidence.

The FTC argues the QSF documents are not cumulative to the evidence in the record. Rather, the FTC asserts the creation of the QSF added a regulatory overlay to the frozen assets that is not established through the Second Supplemental Order, because unlike that Order, the QSF documents trigger various consequences relevant to the disposition of the attorneys' fees Petition, such as the "multi-millions of dollars worth of tax benefits obtained by the Parks, the fact that awarding Ungaretti the interest . . . would result in an additional tax payment being required of Mr. Park, and the fact that this Court has continuing jurisdiction over, not only the Preliminary Injunction whose asset restrictions are still in place, but also over the additional terms and requirements of the QSF." Pl. Rep. at 5.

Such consequences, however, only affect the overall assets that Defendants have. These consequences might be relevant to the issue of whether Defendants should have access to the underlying frozen funds, but they are irrelevant to the issue of whether Defendants are entitled to the interest from the funds. *See FTC v. QT, Inc.* 359 B.R. 889, 892 (N.D. Ill. 2007) (stating that "evidence of Defendants' failure to disclose the existence or status of certain assets" is irrelevant with respect to the interest). The QSF does not create any additional restriction over the funds. It does not prohibit Defendants from petitioning the Court to use the income from the funds for attorneys fees, as the Preliminary Injunction Order which

Defendants submitted to the IRS specifically allows the Defendants to make such a petition.[1]

Moreover, the cases the FTC relies upon in support of its arguments are readily distinguishable. For example, in *In re Starling,* the court granted reconsideration of a bankruptcy discharge after a new and vastly higher home appraisal was discovered. 359 B.R. 901, 916 (Bankr. N.D. Ill. 2007). Such an appraisal was not available at the time the debtors filed their Chapter 7 petition as the market price had not yet changed so dramatically. *Id.* In *Wells Fargo Financial Leasing, Inc. v. Comdisco, Inc,* 2006 WL 1519324 (N.D. Ill. 2006), the court found the defendant's misrepresentations that it possessed good title to computer equipment was newly discovered evidence warranting the court's reconsideration of its decision to disallow the creditor's claim. *Id.*

Unlike these cases, the statements made in the QSF are cumulative of other evidence in the record. *See McKnight v. U.S. Steel Corp.,* 726 F.2d 333, 336-37 (7th Cir. 1984) (finding that documents containing evidence that the plaintiff filed his discrimination complaint with the EEOC in January 1980 was cumulative to other evidence that the plaintiff made such a filing on that date). Given the similar statements made in the Defendants' Brief, at oral argument, and in the Second Supplemental Order, the Court finds the statements in the QSF regarding the interest from the frozen accounts are cumulative of record evidence, and cannot qualify as newly discovered under Rule 60(b)(2).

---

[1] Likewise, the Second Supplemental Order also does not create additional restrictions on Defendants' ability to petition the Court for access to the frozen funds. *See infra* Part III.C.

### 2. The evidence of the QSF is not likely to change the Court's ruling.

The FTC also asserts the evidence of the QSF is likely to lead to a different result, to which Defendants disagree. For support, the FTC cites *DeBoer v. Village of Oak Park,* 86 F. Supp. 2d 804 (N.D. Ill. 1999), *rev'd on other grounds*, 267 F.3d 558 (7th Cir. 2001), in which the court found the new evidence of the religious nature of an event would lead to a different outcome in a case where the court, in deciding its ruling, relied on the plaintiff's characterization of the event as a largely non-religious event. *Id.* at 807-808. Thus, the new evidence in that case was a blatant violation of a federal order. *Id.* In contrast, the Defendants in this case have never made a characterization that they did not create a QSF, that their tax liability was higher than it actually is, or that they had access to the interest from the frozen funds. Although the Court only learned of the QSF's creation through this motion, this fact would not have changed the Court's earlier decision.

**B.  Ungaretti did not make misrepresentations to the Court such that it affected the FTC's ability to fully and fairly present its case.**

The FTC also asserts that Ungaretti made misrepresentations to the Court under Rule 60(b)(3) regarding the scope of the Preliminary Injunction Order by not disclosing the statements made in the QSF. Particularly, the FTC asserts that Ungaretti violated its duty to disclose the existence of the QSF to the Court. The FTC also argues that Ungaretti violated its duty to disclose to the IRS its receipt of the interest and the fact that the Court could release the frozen funds in the future. To prevail on its motion, the FTC must demonstrate by clear and convincing evidence that because of Defendants' misrepresentations, the FTC

was prevented from fully and fairly presenting its case. *See Lonsdorf,* 47 F.3d at 897. The FTC has failed to do so.[2]

As stated above, the statements made in the QSF are cumulative to other statements already in the record. Ungaretti never represented to the Court that Defendants did have access to the interest from the frozen funds, as Ungaretti stated at oral argument and in its brief that Defendants were not entitled to the interest from the funds, and that the funds have never been released to Defendants. Therefore, Ungaretti made no misrepresentations to the Court by not disclosing the specific statements made in the QSF.

The FTC further argues that Ungaretti violated its duty to disclose the existence of the QSF to the Court. "Misconduct" under Rule 60(b)(3) includes a party or its attorney withholding information that he is obliged to disclose. *In re Firrone,* 272 B.R 213, 215 (B.R. N.D. Ill. 2000). Under the Northern District of Illinois Local Rules and the Illinois Rules of Professional Conduct, counsel is prohibited from "suppress[ing] any evidence that the lawyer or client has a legal obligation to reveal or produce." ILCS S. Ct. Rules of Prof. Conduct, RPC Rule 3.3; N.D. Ill. L.R. 83.53.3. Unlike *In re Firrone,* where the debtor had a statutory duty to disclose information to the Trustee, the Court is unaware of any statutory duty to

---

[2] The FTC argues it does not need to establish misrepresentation or other misconduct by clear and convincing evidence. Rather, it asserts it only needs to demonstrate that the misprepresentations or misconduct "affected [its] ability to present [its] case, not that [it] would have won had the fraud or misconduct not occurred." *Ty Inc. v. Softbelly's, Inc.,* 353 F.3d 528, 537 (7th Cir. 2003). The Court agrees the FTC must only prove the alleged misrepresentations affected its ability to present its case, but it still must do so by clear and convincing evidence. Regardless, however, even if a lesser standard is required, as discussed below, the Court finds the FTC has failed to put forth enough evidence to satisfy even a lesser standard than clear and convincing evidence.

disclose the creation of a QSF to the Court and opposing parties. *See In re Firrone,* 72 B.R. at 217 (finding there to be "no question" that the debtor had a duty to inform the Trustee of her interest in her father's estate, based upon a particular statute providing for such a duty). The Seventh Circuit, however, has stated that a party's counsel has "a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation." *Cleveland Hair Clinic, Inc. v. Puig,* 200 F.3d 1063, 1067-68 (7th Cir. 2000). Courts in this circuit have found that attorneys have violated such a duty when material evidence was not disclosed to the Court. *See id.* at 1067 (finding that the party had a duty to disclose the existence of a simultaneously filed state lawsuit); *First South v. LaSalle National Bank,* 1991 WL 94537 (N.D. Ill. 1991) (finding it "distressing" that the party's counsel did not disclose material evidence affecting the contract provision at issue in the case).

Unlike these cases, the QSF evidence is not as significant. Given that counsel had no statutory duty to disclose the QSF, and given that the Court's knowledge of the QSF would likely not have affected its decision, the Court finds Defendants did not have a duty to disclose the QSF to the Court.

Regardless, however, the Court finds the failure to disclose the existence of the QSF did not affect the FTC's ability to fully and fairly present its case. As stated above, the statements in the QSF are cumulative of other evidence in the record. Such evidence was either put forth in the oral argument and briefs for the Petition, or were available to both parties to be put forth. The FTC was aware of the similar statements in the record, and had the ability to use these statements to present its case. Given the multitude of similar

statements, the Court is not convinced that being unaware of one more similar statement affected the FTC's ability to present its case.

Second, the FTC argues that Defendants violated their duty to disclose to the IRS the possibility that they might in the future gain access to the frozen funds. Because the IRS is not a party to this action, Defendants' duty to the IRS is not relevant to this case. According to the Internal Revenue regulations governing the creation of a QSF, "[a] fund, account, or trust is 'ordered by' or 'approved by' a governmental authority described in paragraph (c)(1) of this section when the authority issues its initial or preliminary order to establish, or grants its initial or preliminary approval of, the fund, account, or trust, *even if that order or approval may be subject to review or revision.*" 26 C.F.R. § 1.468B-1(e) (emphasis added). Thus, a QSF can be created even if the order creating the fund might change. Regardless, however, the Court cannot contemplate how such a failure to disclose this information would have affected the FTC's ability to present its case.

Third, the FTC argues that Defendants violated their duty to disclose to the IRS their receipt of the interest. The FTC argues that because Defendants received a tax deduction from its creation of the QSF, it has an obligation to report to the IRS its receipt of funds from the QSF. Again, any duty that Defendants have to the IRS regarding their receipt of the interest is not relevant to this case. The regulations are silent as to a party's continuing obligation to disclose changes to the QSF. *See* 26 C.F.R. § 1.468B-1. Any further obligation to disclose such information is not for this Court to decide, as the IRS is not a party in this action.

15

Regardless, Defendants' duty to disclose such information to the IRS in no way impacts the FTC's ability to present its case. As previously stated, the Defendants' assets might impact the issue of accessing the underlying frozen funds, but they do not affect the Court's decision to grant access to the interest from those funds. Thus, any tax liabilities the defendants might have as a result of receiving the interest do not impact the Court's decision to award them interest. Thus, it certainly could not have affected the FTC's ability to present its case.

**C.      The Court will not *sua sponte* reverse its previous grant of attorneys' fees based upon the discussion of the Second Supplemental Order in the parties' briefs.**

In its reply, the FTC argues the existence of the Second Supplemental Order alone is grounds for the Court to *sua sponte* reverse its fee award. This Court has the "inherent power to reconsider rulings until a final judgment is entered." *Chetto v. Chetto,* 282 B.R. 215, 216 (Bankr. N.D. Ill. 2002). Although a final judgment has been entered in this case, the Final Judgment Order reserved the right to enter additional orders awarding attorney's fees, and thus the Court maintains the power to reconsider any such rulings. This Court, however, is not inclined to do so.

The Second Supplemental Order was not only in existence at the time of the Court's December 22 Order awarding attorneys' fees to Defendants, but both parties stipulated to the Order. Thus, the FTC had the opportunity to use the Second Supplemental Order as a basis for its argument against the Court awarding the interest to Defendants at the time the December 22 Order was entered. The FTC's realization that they failed to put forth this

16

evidence to support their argument on the petition does not give them grounds for reconsideration.

Furthermore, the Court finds the Second Supplement Order does not alter Defendants' ability to access the interest from the frozen accounts. The FTC argues that Defendants could not have reasonably relied on the interest from the frozen funds because they state in the Second Supplemental Order, as well as in the QSF documents, that they had no access or control over the interest from the frozen funds. Defendants' statements, however, were correct. They could not access the interest from the funds unless the Court entered an Order allowing them to do so.

The Second Supplemental Order was not intended to change the original Preliminary Injunction Order in this regard, but rather only served to consolidate the various funds. Paragraph 2 of the Second Supplemental Order expressly provides: "This Order does not otherwise amend or alter the Stipulated Order or the Supplemental Order to the Stipulated Order." Defendants were still free to petition the Court to access the income from the funds for the purposes listed in the original order. Stating that Defendants did not have access to the funds does not mean they cannot argue for such access without committing a misrepresentation.

## IV. CONCLUSION

**For the reasons set forth in this opinion, the Court denies the FTC's motion for reconsideration.**

**SO ORDERED THIS 8th DAY OF April, 2008.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Theodore H. Hoppock
Heather Hippsley
Janet M. Evans
Edward B. Glennon
Serena Viswanathan
Federal Trade Commission
600 Pennsylvania Ave., NW NJ-3212
Washington, DC 20580

Steven M. Wernikoff
Federal Trade Commission
55 E. Monroe Street, Suite 1860
Chicago, IL 60603
Counsel for Plaintiff

Michael Andrew Ficaro
David Levitt
John P. Buckley
Richard Henry Tilghman
Ross Edward Kimbarovsky
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602

Helen E. Witt
Wendy Netter Epstein
Kirkland & Ellis LLP
200 East Randolph Drive, Suite 6100
Chicago, IL 60601

Joanne Angeline Smet
QT, Inc.
500 West Algonquin
Mt. Prospect, IL 60056

L. Judson Todhunter
Defrees & Fiske
200 South Michigan Ave., Suite 1100
Chicago, IL 60604

Counsel for Defendant