# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**QT, INC., Q-RAY COMPANY,** )<br>**BIO-METAL, INC., QUE TE PARK,** )<br>**a.k.a. ANDREW Q. PARK,** )<br>**and JUNG JOO PARK,** )<br>)<br>**Defendants.** ) | Case No. 03 C 3578<br><br>Magistrate Judge Morton Denlow |

## MEMORANDUM OPINION AND ORDER

Plaintiff Federal Trade Commission ("Plaintiff" or "Commission") brought this action against Defendants under Section 13(b) of the Federal Trade Commission Act ("the Act"), seeking monetary and injunctive relief for alleged violations of Sections 5 and 12 of the Act. 15 U.S.C. §§45(a), 52 and 53(b), as amended. Following a seven-day bench trial, this Court found Defendants Que Te Park, QT, Inc., Q-Ray Company, and Bio-Metal, Inc. ("Defendants") violated Sections 5 and 12 of the Act; but found that Jung Joo Park ("Mrs. Park") had not committed a violation. *F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008). The Court subsequently entered a Final Judgment Order ("Order"), in which it continued the asset freeze previously imposed in the Stipulated Order for Preliminary Injunction With Asset Transfer Restrictions and Other Equitable Relief ("Preliminary Injunction"). Dkt. 211, 34. Two bank accounts of QT Foundation

("Foundation") totaling $1,410,000 in the custody of Foster Bank were among the assets frozen (the "Disputed Accounts").

Two motions related to the Order and the asset restriction provision of the Preliminary Injunction are presently before the Court: (1) the Motion of QT Foundation to Release Its Bank Accounts from Continuing Freeze Order ("Motion to Release"); and (2) the Cross Motion of Plaintiff Federal Trade Commission for Turnover to Commission of QT Foundation Accounts Subject to the Freeze Order ("Cross Motion"). Dkt. 317, 326. Catherine Steege, as the trustee appointed in bankruptcy for the estates of Que Te Park, Q-Ray Company, and AQP Liquidating, Inc., the successor to QT, Inc., ("Trustee") joins in the Commission's Opposition to the QT Foundation motion. Dkt. 323. The Commission and the Trustee also request the Court to maintain the asset freeze over the remaining assets until such time as the Trustee is able to administer those assets for the benefit of the bankruptcy estates. For the reasons discussed herein, the Court denies the Foundation's Motion to Release and grants the Commission's Cross Motion to turn over the Disputed Accounts to the Commission.

## I. BACKGROUND FACTS

The history and facts of this case are extensive. This Court detailed the factual background of this case in *F.T.C. v. QT, Inc.,* 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008). Therefore, this Court provides as background only what is necessary to decide the present motions.

On May 27, 2003, the Commission filed a complaint for permanent injunction, and

other equitable relief, against Defendants. Dkt. 1. The Commission alleged that Defendants engaged in deceptive acts or practices and false advertising in violation of Sections 5(a) and 12 of the Act. Dkt. 1, 211. On May 29, 2003, the Commission successfully obtained a Temporary Restraining Order ("TRO") against Defendants that, *inter alia*, froze Defendants' assets. Dkt. 2.

On June 9, 2003, the parties appeared before District Judge John W. Darrah for a hearing on the Commission's preliminary injunction motion. Dkt. 25, 63, 64. Prior to the hearing, Judge Darrah requested the parties to enter chambers and to discuss a possible negotiated resolution to the preliminary injunction issues. While in chambers, Defendants agreed, without argument, to all of the substantive relief requested by the Commission in its TRO and in its preliminary injunction motion; the parties also negotiated restrictions to be placed on Defendants' assets. The parties orally agreed on a $17 million asset restriction on Defendants' assets, which included $1,410,000 of the Foundation's assets. *See also* Declaration of Theodore H. Hoppock in Support of Opposition of Plaintiff Federal Trade Commission to Motion of QT Foundation to Release its Bank Accounts from Continuing Freeze Order and Cross Motion for Turnover of Those Assets to the Commission ("Hoppock Decl.") (Dkt. 322), at Ex. 1. The terms of the oral agreement became effective on June 11, 2003 when the court entered the Preliminary Injunction. Dkt. 34.

On August 21, 2003, in Defendants' Motion for Relief From or in the Alternative to Amend the Preliminary Injunction Order ("Motion for Relief"), Defendants sought to lift the

asset restriction from the Disputed Accounts. Dkt. 63. Defendants claimed the Foundation was not a party to the litigation and that the Foundation's assets could only be used for charitable purposes. The court summarily denied Defendants' motion. Dkt. 61.

On September 8, 2006, following a bench trial, the Court issued a Memorandum Opinion and Order finding that Defendants' infomercials, which aired on television between 2000 and 2003, contained deceptive claims regarding the Q-Ray bracelet and its purported ability to eliminate pain. *QT, Inc.,* 448 F. Supp. 2d at 919, 975. The Court found that Defendants' false claims caused $87 million in consumer injury. *QT, Inc.*, 448 F. Supp. 2d at 953. As a remedy, the Court ordered refunds be made to the consumers and ordered Defendants' current assets frozen to ensure such remedy. *Id.*

On November 13, 2006, the Court issued a Final Judgment Order which continued the asset freeze previously entered in the preliminary injunction. Dkt. 211. Specifically, the Foundation assets were stated in the Order to be assets "belonging to, under the control of, or for the benefit of the Defendant Judgment Debtors, in whole or in part . . . that may or may not be traceable to ill-gotten gains, that are restricted pursuant to the Stipulated Preliminary Injunction." Dkt. 211, at Attachment A. The asset restriction in the preliminary injunction, in relevant part, ordered the following:

> Defendants and their officers, directors, agents, servants, employees, attorneys, and all other persons or entities in active concert or participation with them who receive actual notice of this [o]rder by personal service or otherwise, are hereby enjoined from: selling, liquidating, assigning, transferring, converting, loaning, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing of $17 million in assets wherever located, including any assets outside the territorial United States, that are: (1) owned or controlled by any Defendant, in whole or in part; or (2) in the actual or constructive possession of any Defendant. . . .

Dkt. 34. The Final Judgment Order prohibits any transfer or disposition of such frozen assets, including the Foundation assets, without the prior, express written permission of the Commission. Dkt. 211, at ¶ VII.B.2. In addition, the Final Judgment Order empowered the Commission to seek the entry of "additional Orders to ensure that Defendants transfer to the Commission the required sum . . . ." Dkt. 211, at ¶ V, VII.A.4.b.

The Foundation has now filed a Motion to Release and a supporting memorandum ("Foundation Memo"). Dkt. 317, 335. In support of its motion, the Foundation argues that the asset restriction does not apply to the Foundation and that the Disputed Accounts should be released from the asset freeze to allow the Foundation to continue making charitable distributions. Furthermore, as a procedural matter, it argues that its accounts should not be used to satisfy Defendants' judgment since the Foundation is not a party to this litigation and is distinct from Defendants.

In response, Plaintiff has filed a Cross Motion and a supporting memorandum ("Commission Memo"). Dkt. 326. In support of its Cross Motion, Plaintiff argues that (1) the Disputed Accounts are held in a constructive trust for the benefit of injured consumers; (2) the Foundation may not retain the fruits of QT, Inc.'s fraud; (3) retention of the frozen assets would unjustly enrich the Foundation; and (4) the Foundation is not properly established nor is it run by responsible individuals. The Court held oral argument on the two motions on February 9, 2009. Dkt. 344. The Court granted the Foundation until February 23, 2009 to dispute the Commission's contentions regarding the source of the moneys in the Disputed Accounts. Dkt. 342. No filing was made.

## II. DISCUSSION

The central issue before this Court is whether the Disputed Accounts should be subject to the Court's Final Judgment Order in order that $1,410,000 be transferred from the Foundation's bank accounts to the Commission so that the funds may be used to satisfy the judgment against the Defendants. To reach a decision, this Court must first determine whether the Foundation participated with Defendants and knowingly received fruits of fraud. For the following three reasons, this Court denies the Foundation's Motion to Release and grants the Commission's Cross Motion: (1) the Foundation had actual knowledge, at the time of the transfer, that it was accepting fruits of fraud; (2) the Foundation is bound by the asset restriction provision of the Preliminary Injunction; and (3) the funds are currently in a constructive trust; to allow the Foundation to take ownership of the funds would constitute unjust enrichment.

## A. QT Foundation Had Actual Knowledge That It was Accepting Fruits of Fraud.

Under Illinois law, a person who accepts fruits of fraudulent conduct is also guilty of that fraud. *In re Lake States Commodities, Inc.*, 936 F. Supp. 1461, 1478 (N.D. Ill. 1996). In *Lake States*, Defendants Thomas Collins and his company, Lake States Commodities, committed fraud by selling futures contracts without having been properly registered as a futures commission merchant ("FCM"). *Id.* at 1464-65. Soon after Collins began his activity he started working with Geldermann, a registered FCM. *Id.* at 1465. Geldermann received commissions for each of Collins' trades; in return, Geldermann provided Collins with a desk and phone to enhance his "appearance of legitimacy." *Id.* Plaintiffs claimed they made their investments with Collins because of his "appearance of legitimacy [and because of the] profitability fostered by Geldermann." *Id.* at 1466. Geldermann defended against Plaintiffs' claims by stating it did not provide "substantial assistance" to Collins, but rather merely allowed Collins to use its services and its reputation to carry out his fraudulent scheme. *Id.* at 1478. The court rejected Geldermann's argument and held Geldermann also liable for the fraud because, despite knowing that he was receiving a substantial benefit from Collins' fraudulent activity, Geldermann willingly continued to receive the benefit.

Likewise, the Foundation is liable for fraud because it knowingly accepted fruits of fraud from QT, Inc. The Commission contends that in anticipation of costly litigation, Defendant Que Te Park purposefully created the Foundation as a means by which to conceal QT, Inc.'s fraudulently obtained proceeds. This Court accepts Plaintiff's interpretation of

7

the facts that QT, Inc.'s "donations" to the Foundation were neither made nor received in good faith. In November or early December of 2002, several months prior to the commencement of this litigation, QT, Inc. knew that the Mayo Clinic released unfavorable results of the effectiveness of its medical bracelet. *QT, Inc.*, 448 F. Supp. 2d at 937. The results showed that the Q-Ray bracelet was no more effective than a placebo and strongly supported the fact that QT, Inc. had engaged in deceptive marketing and advertising. *Id.* On December 12, 2002, Defendant Que Te Park incorporated the Foundation; the following day, December 13, 2002, Defendant QT, Inc. contributed $1 million to the Foundation. A few months later, on March 25, 2003, Defendant contributed an additional $400,000 to the Foundation; an additional $10,000 was contributed to the Foundation at a later date. These funds were transferred to the Foundation's bank accounts at Foster Bank and have remained there since the court ordered the asset freeze in the preliminary injunction.

In light of Defendant Que Te Park's dual positions as an officer for both QT, Inc. and the Foundation, the Foundation is deemed to have actual knowledge at the *exact moment* at which the transfer of funds took place because the donor was also the donee. In other words, the left hand certainly knew what the right hand was doing. Just as in *Lake States*, where Collins used Geldermann to legitimize his conduct in the eyes of investors, so too has Defendant Que Te Park attempted to use the Foundation to legitimize the funds in the eyes of the Commission and of this Court. It is clear the Foundation had actual knowledge that QT, Inc.'s transfers to it were fruits of fraud.

**B.     QT Foundation is Bound by the Asset Restriction of the Preliminary**

**Injunction.**

In its Motion to Release, the Foundation argued that it should not be subject to the asset restriction because (1) this Court lacks subject matter and personal jurisdiction, and (2) the Commission does not have a claim of right to the funds. This Court rejects these arguments.

    **1.    The Court has Jurisdiction Over the Assets of the Foundation and Over the Foundation Itself.**

The Foundation has two bank accounts at issue—one account contains $1.4 million and a second account contains $10,000. Both accounts, currently held at Foster Bank, are subject to this Court's jurisdiction because (1) the Preliminary Injunction ordered that the funds be subject to the Court's jurisdiction; and (2) the Foundation consented to the injunction and voluntarily submitted its funds to the Court.

On June 11, 2003, the court entered a Preliminary Injunction, whereby $1,410,000 held in the Foundation's bank accounts was "frozen." Dkt. 34, 37. The Foundation failed to appeal the injunction; although Defendants later sought to amend the preliminary injunction order, Magistrate Judge Ian H. Levin denied their motion. Dkt. 61. Therefore, the Preliminary Injunction became the law of the case; the issue of whether the Foundation may be subject to the court order had been resolved. *HK Systems, Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009). The Foundation's present motion is merely a second attempt to challenge an issue previously decided by Judge Levin, which was never challenged on appeal.

This Court also has jurisdiction over the funds because the Foundation voluntarily

9

subjected its funds to the court's jurisdiction. First, the mere fact that the Preliminary Injunction was "stipulated" indicates that Defendants agreed with the Commission that the Foundation's funds should be included; the Foundation's failure to object to its inclusion shows its agreement with the terms. Dkt. 34. The Foundation had full notice and knowledge of the Order; its silence was deemed acquiescence. Although the Foundation argued during oral argument that there was no acquiescence on its part, and that it had been a hard-fought negotiation in which the matter was "fully briefed on its merits," the facts rebut this contention. Dkt. 344, at 30. All parties agreed to the terms of the Preliminary Injunction, which included an asset restriction on the Foundation's funds. Dkt. 34.

Second, in addition to its voluntary act of placing the Disputed Accounts under the Court's jurisdiction, the Foundation also made a voluntary admission. In filing its 2003 tax return, the Foundation informed the Internal Revenue Service that "[the Foundation] is not a party to this lawsuit, but, under the terms of the preliminary injunction, [the Foundation's] assets have been frozen . . . and [b]y virtue of the imposition of [the preliminary injunction], the income generated by [the Foundation's] assets is subject to a 'constructive trust' under which [the Foundation] has a future interest contingent upon the outcome of the . . . litigation." Dkt. 322-5, at 7. In other words, the return, filed by Defendant Que Te Park, admitted that the court had jurisdiction over the funds. As a result, this Court has the authority to subject the Foundation's funds to the asset restriction of the Preliminary Injunction.

The Court also rejects the Foundation's argument that this Court lacks personal

jurisdiction over the Foundation. Rule 65(d) of the Federal Rules of Civil Procedure ("Rule 65(d)") empowers this Court to enter a binding injunction upon "the parties; the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with [Defendants] as long as such individuals receive actual notice of [the injunction] by personal service or otherwise." Fed. R. Civ. P. 65(d). According to Rule 65(d), this Court has personal jurisdiction over an entity that acts in "active concert or participation" with Defendants and receives notice of the court order at issue.

In *F.T.C. v. Cleverlink Trading Limited*, the court found it had personal jurisdiction to enter a preliminary injunction, which froze the assets of a non-party, because of the non-party's role as an "agent" for the defendant. No. 05 C 2889, 2006 WL 1735276, at *1, 3 (N.D. Ill. June 19, 2006). Defendant Cleverlink violated the Act by sending commercial email messages promoting sexually-oriented internet web sites and then collecting payment for access to the sites. *Id.* at *1. Cleverlink contracted with Oceanic Telecommunications Services ("Oceanic"), which acted as an intermediary and processed the payments made by the consumers. *Id.*

In a preliminary injunction order, the court directed that, upon being served with the order, Oceanic must "hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale or other disposal of any account or asset of, or held on behalf of any Defendant, including [Cleverlink], unless authorized in writing by the Court or counsel for [the Commission]." *Id.* at *2. When Oceanic allegedly violated this injunctive freeze order, the Commission urged

11

that Oceanic show cause why it should not be held in contempt of court. *Id.* The court expressly rejected the argument that Oceanic should not be bound by the order merely because it was not a party to the litigation. *Id.* at *3-4. Instead, it identified that in acting as Cleverlink's sub-account holder, Oceanic had acted as Cleverlink's agent, which comported with Rule 65(d) and authorized the court to impose a binding injunction on the defendant and its "agents." *Id.* Similarly, in the instant case, this Court concludes that the Foundation, a non-party, is bound to the Order because it acted in concert and in participation with Defendants.

Although the Foundation contends that "it has not participated in this litigation, and does not do so now," this contention is illusory. Dkt. 335, at 5. Notwithstanding the agreement made on June 9, 2003 within Judge Darrah's chambers and the August 21, 2003 Motion for Relief filed with the court, the Foundation has voluntarily sought relief in this litigation and continues to do so now. By seeking relief from this Court, the Foundation has subjected itself to this Court's jurisdiction.

Moreover, under this Court's jurisdiction, the Commission expressly was empowered to "seek entry of additional Orders to ensure that Defendant's transfer to the Commission the required sum . . . ." Dkt. 211, at ¶ VII.A.4.b. The Final Judgment Order also explicitly "retain[ed] jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order." *Id.* at ¶ XXI. Therefore, the Order authorizes the Commission to seek asset turnovers and to enforce the Order with regard to assets frozen by the Order. *See F.T.C. v. Trudeau*, 572 F. Supp. 2d 919, 925 (N.D. Ill. 2008) ("[T]he court has the

inherent power to enforce its orders.")

The Foundation also argues that it acted distinct from Defendants and should not be treated as if it acted "in active concert or participation." The Court rejects this argument. As discussed above, this Court finds that the Foundation was created as a means to conceal Defendants' ill-gotten proceeds and, in light of the dual positions of Defendant Que Te Park, the Foundation had actual knowledge that it was receiving fruits of Defendant's fraud. Under Rule 65(d), by reason of the Foundation's voluntary acts and its current Motion to Release, this Court has personal jurisdiction over the Foundation and the Disputed Accounts.

### 2. The Commission Has a Claim of Right to the Funds.

This Court concludes that the Commission has met its burden of proof that the funds rightfully belong to the consumers. As discussed below, the funds currently in the Court's possession are effectively in a constructive trust for the benefit of consumers and must be turned over to the Commission for consumer redress.

In *F.T.C. v. Think Achievement Corporation*, the Seventh Circuit held that once a court determines frozen assets constitute proceeds of the fraud that are necessary to compensate the victims of the fraud, the defendant no longer has a right to the funds. 312 F.3d 259, 262 (7th Cir. 2002). Moreover, when a third party possesses the funds that are believed to be fruits of fraud, it is that party's burden to prove that the funds do not rightfully belong to the fraudulent actor. *Id.*

In *Think Achievement*, the third party failed to meet that burden. *Id.* After the Commission satisfied its burden of proving the defendants had violated the Act, the court

13

issued a judgment that froze the defendants' assets and the assets of a defendant's wife. *F.T.C. v. Think Achievement*, 144 F. Supp. 1013, 1020-22 (N.D. Ind. 2000). When the wife objected to the asset freeze, the Commission provided evidence that she had "received significant sums of money and other property . . . from the [d]efendants' fraudulent activities." *Id.* at 1021. The court concluded that in order to promote equity and prevent unjust enrichment, the wife's funds must remain frozen in a constructive trust for the benefit of the defrauded consumers. *Id.* at 1021-22. If the wife had met her burden and shown that her funds were not fruits of fraud and that they did not belong to the defendant, then the funds would likely have been released from the asset restriction. *See, e.g., Society of Lloyd's v. Collins*, 284 F.3d 727, 731 (7th Cir. 2002) (where a defendant's wife was successfully released from a judgment's asset restriction when she showed the money did not belong to the judgment debtor but was in a joint account and was used for maintaining their rental property).

In the instant case, this Court determined that Defendants committed fraud and that their accounts and the accounts of third parties, including the Foundation, must be frozen to preserve the funds for consumer redress. This Court has established that the Foundation currently holds the fruits of fraud. Therefore, it is the Foundation's burden to prove that its funds do not belong to the Defendants and therefore should not be used to satisfy their judgment. The Foundation fails to meet this burden. On February 9, 2009, this Court gave the Foundation additional time to provide a factual basis for its claims. Dkt. 342, 339. To date, the Foundation has failed to provide such support. The Foundation admitted in its 2003

tax returns that the funds were "subject to a constructive trust" on behalf of consumers. Dkt. 322-5, at 7. The Commission clearly has a claim of right to the Disputed Accounts to be used for consumer redress.

**C.      The Funds Are in a Constructive Trust and Must Be Turned Over to the Commission.**

A constructive trust is created by the court to avoid unjust enrichment "when a [party] has obtained money to which he is not entitled. . . [and] in equity and good conscience he ought not retain." *Smithberg v. Illinois Mun. Retirement Fund*, 735 N.E.2d 560, 565 (Ill. 2000). Once a court creates a constructive trust, the party in possession of the wrongfully obtained funds becomes the "constructive trustee" and is obligated to transfer the funds to the beneficiary. *Id.* at 565-66. Although the existence of a constructive trust is governed by state law, the Seventh Circuit and some federal district courts have either imposed or recognized its creation when the case involves funds that were frozen at the initial stage of litigation in order to preserve the possibility of consumer redress. *Think Achievement*, 144 F. Supp. 2d 1013, 1020 n.3 (N.D. Ind. 2000) (applying Indiana law), *aff'd* 312 F.3d 259 (7th Cir. 2002). Such is the case in the present matter.

Although the funds are currently held in the Foundation's bank accounts, the Foundation does not have a claim of right; instead this Court finds that the funds are currently held in a constructive trust to which the Foundation is the trustee. Because the Commission does have a claim of right, this Court directs the Disputed Accounts be turned over to the Commission so that the funds may be used for consumer redress. To allow

15

otherwise would be an abuse of discretion. *Think Achievement*, 312 F.3d at 262. Indeed, to allow otherwise would constitute unjust enrichment because the Foundation would retain fraudulently obtained funds at the expense of wronged consumers.

In *Scholes v. Lehmann*, religious organizations petitioned the court to be released from a court order that mandated they return fraudulently obtained funds they had received as donations from fraudulent actors. 56 F.3d 750, 760 (7th Cir. 1995). The organizations sought exemption based on their status as not-for-profit charities. *Id.* Although the Seventh Circuit believed the organizations had been innocent beneficiaries, it held that they were not exempt from the fraudulent conveyance statute, which provides that "every gift . . . or transfer . . . made with the intent to disturb, delay, hinder or defraud creditors or other persons . . . shall be void as against such creditors . . . and other persons." *Id.* at 753. Therefore, in *Scholes*, the Seventh Circuit set a precedent that the interest innocent beneficiaries may have in retaining fruits of fraud will not trump the interest that victims of such fraud may have in recovering those funds.

Unlike the organizations in *Scholes*, the Foundation is not an unsuspecting, innocent third party. Instead, it is an organization that had full knowledge that the funds for the donations were the fruits of fraud. Defendant Que Te Park was the leader of both the Foundation and QT, Inc. The Foundation knew the funds were illegally obtained. Therefore, it is appropriate that the funds are held in a constructive trust for the benefit of the consumers.

### III. CONCLUSION

**For the reasons set forth in this opinion, Plaintiff's Cross Motion for Turnover to Commission of QT Foundation Accounts Subject to Continuing Freeze Order is granted; and the Motion of QT Foundation to Release Its Bank Accounts from Continuing Freeze Order is denied. The funds currently held in QT Foundation's bank accounts by Foster Bank shall be immediately turned over to the Commission for use as consumer redress or disgorgement as becomes appropriate after the results of the consumer notification program are tabulated.**

**SO ORDERED THIS 17th DAY OF MARCH, 2009.**

_____
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

| | |
|---|---|
| Theodore H. Hoppock | Michael A. Ficaro |
| Reille C. Montague | Richard H. Tilghman |
| Heather Hippsley | Ungaretti & Harris, LLP |
| Janet M. Evans | 3500 Three First National Plaza |
| Edward Glennon | 70 West Madison |
| Federal Trade Commission | Chicago, IL 60602-4283 |
| 600 Pennsylvania Avenue, NW, NJ-3213 | |
| Washington, DC 20580 | Counsel for Defendants |

Counsel for Plaintiff

Don R. Sampen
Clausen Miller
10 South LaSalle Street
Chicago, IL 60603

Counsel for QT Foundation